DA 24-0633

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2025 MT 139

---

IN THE MATTER OF:

I.R.S. and M.W.A.H.,

    Youths in Need of Care

---

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause Nos. DN 21-146
and DN 22-225
Honorable Rod Souza, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Gregory D. Birdsong, Birdsong Law Office, Santa Fe, New Mexico

    For Appellee:

        Austin Knudsen, Montana Attorney General, Katie F. Schulz,
Assistant Attorney General, Helena, Montana

        Scott D. Twito, Yellowstone County Attorney, Heather Webster,
Deputy County Attorney, Billings, Montana

---

Submitted on Briefs:  May 21, 2025

Decided:  July 1, 2025

Filed:

_____
             Clerk

Justice Katherine Bidegaray delivered the Opinion of the Court.

¶1 H.R.A.H. (Mother) appeals the July 2024 orders of the Montana Thirteenth Judicial District Court, Yellowstone County, awarding guardianship of her children, I.R.S. (born July 2018) and M.W.A.H. (born September 2022) to non-kinship, non-Native American foster parents. We address the following restated issues:

1. *Was Mother denied her right to counsel when the District Court adjudicated I.R.S. a youth in need of care without Mother's counsel present?*

2. *Did the District Court err in failing to treat Mother's questions about transferring her case to tribal court as a motion to transfer under § 41-3-1310(3), MCA?*

3. *Did the District Court erroneously deny Aunt's motion to intervene in the guardianship proceedings without a hearing?*

4. *Did the District Court erroneously conclude that good cause existed to deviate from ICWA placement preferences?*

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 In mid-May 2021, the Montana Department of Public Health and Human Services (Department) removed two-year-old I.R.S. from Mother's home in Billings, Montana, due to Mother's illicit drug use (methamphetamine) and associated safety concerns.[1] I.R.S. is a member of the Northern Cheyenne Tribe, triggering the federal Indian Child Welfare Act

---

[1] I.R.S.'s father was incarcerated at the time. He did not appeal the July 2024 guardianship order.

(ICWA).[2]  The Department initially placed I.R.S. with Mother's sister, A.B.C. (Aunt), also a member of the Northern Cheyenne Tribe.

¶3     In late May 2021, the Department petitioned for adjudication of I.R.S. as a youth in need of care (YINC).  At hearing on August 31, 2021, and on party stipulation, the District Court adjudicated I.R.S. a youth in need of care pursuant to § 41-3-437, MCA, and granted the Department temporary legal custody.  On September 28, 2021, the court ordered Mother to complete a treatment plan requiring her to address and resolve substance use, mental health, safe parenting, safe housing, and income/basic needs issues.

¶4     At the September 28, 2021 treatment plan hearing, the Department advised that it had recently removed I.R.S. from Aunt's home based on disclosures of physical abuse and placed him with a non-kinship, non-Native American foster family.  Mother did not object to the new placement.  At a subsequent March 2022 permanency plan hearing, Mother also had no objection to the non-ICWA-preferred placement.

¶5     M.W.A.H. was born in early September 2022 and is also a member of the Northern Cheyenne Tribe.[3]  The day after his birth, the Department removed M.W.A.H. from Mother's custody based on her continued mental health and substance use issues (still unresolved from her September 28, 2021 treatment plan).  At that time, the Department placed M.W.A.H. and I.R.S. together with a new non-kinship, non-Native American foster

---

[2] The Northern Cheyenne Tribe confirmed I.R.S. and M.W.A.H.'s tribal enrollment in September and December 2022, respectively.

[3] M.W.A.H.'s birth father was unknown.

family. Shortly after, the Department sought to extend temporary custody of I.R.S. and to adjudicate M.W.A.H. a youth in need of care. The proceedings were consolidated at a December 6, 2022 hearing, following which the District Court extended custody for I.R.S. and adjudicated M.W.A.H. a youth in need of care. Mother did not contest the YINC adjudication or deviation from ICWA placement preferences.

¶6 In July 2023, the Department petitioned for guardianship of I.R.S. and M.W.A.H. and permanent placement with the non-kinship, non-Native American foster family they had lived with since September 2022. Mother initially contested guardianship, so the District Court set the matter for a contested hearing.

¶7 The day before the scheduled guardianship hearing, Aunt filed a motion to intervene in the proceedings, asserting she had a right under ICWA as an extended family member to enforce ICWA placement preferences. The Department objected on the grounds that § 41-3-422(9)(b), MCA, as construed in *In re U.A.C.*, 2022 MT 230, ¶ 16, 410 Mont. 493, 520 P.3d 295, allows a relative to intervene in Title 41, chapter 3, MCA, proceedings only in cases alleging abandonment, which this was not, and that 25 U.S.C. § 1911 allows intervention only by an "Indian Custodian," which Aunt was not. At the October 4, 2023 hearing on the matter, Aunt withdrew her motion, and the parties stipulated that she would instead be deemed an "interested person" pursuant to § 41-3-422(9)(a), MCA.

¶8 The parties convened for the rescheduled guardianship hearing on February 20, 2024. That hearing had to be rescheduled, however, after Mother, who previously indicated she would consent to guardianship, changed her mind after the Department released its witnesses.

4

¶9 At the rescheduled March 4, 2024 guardianship hearing, the Department presented the testimony of the foster placement, who said she would facilitate Mother's ongoing contact with the children; that cousins of I.R.S. and M.W.A.H., one of whom was Northern Cheyenne, also lived in her home; and that she would maintain the children's connection to their tribe, including continuing to participate in Western Native Voice and taking the children to powwows. I.R.S.'s pediatrician also testified for the Department that I.R.S. exhibited numerous developmental delays but had improved in all areas with regular therapies and that I.R.S. was receiving needed care and thriving in his current placement environment.

¶10 Despite previously opposing guardianship, when separately asked by the children's counsel, guardian ad litem (GAL), and her own counsel, Mother unexpectedly testified that she now approved of the guardianship placement. After a brief recess, however, Mother changed her mind again and the court continued the hearing until April 3, 2024.

¶11 At that time, the Department CPS caseworker (assigned in 2023) testified that Mother had failed all aspects of her court-ordered treatment plan, her condition of unfitness was unlikely to change in a reasonable time, and guardianship was in the children's best interests. Specifically, Mother was not seeking treatment for her substance use or mental health issues, despite provider recommendations; while she initially attended supervised visitation twice weekly, she was then seeing the children only once weekly and not engaging with or safely parenting them even under supervision; she was unwilling to engage with the Department or providers and seemed disinterested in her children; and she had failed to obtain or sustain safe and stable housing. The Department caseworker

5

testified that, instead of improving, Mother had "gone backwards" since Department involvement.

¶12    The caseworker also testified that the Department had made active, diligent efforts to find an ICWA-preferred placement, including contacting the children's tribe and inquiring with the parents' suggested placements, but was unsuccessful. The Northern Cheyenne Tribe's qualified ICWA expert testified that Mother was unable to provide a safe environment for her children and failed to engage in Department efforts to help her meet her children's needs. She believed it was in the children's best interests to be placed in a guardianship because, even while not with an ICWA-preferred placement, guardianship was still a culturally appropriate permanency option. The Northern Cheyenne Tribe's ICWA agent also supported guardianship and believed that remaining with their current foster placement was in the children's best interests. The GAL also supported guardianship with the children's current foster placement.

¶13    Mother, Aunt, and the children's counsel, however, advocated for appointment of Aunt as guardian. Aunt testified that she and her husband had plenty of room for I.R.S. and M.W.A.H. in their home and with their three children. She said her home was a better guardianship placement because she and her husband, both Northern Cheyenne, would take the children to ceremonies. While she was previously licensed as a foster care provider through the Northern Cheyenne Tribe, at the time of the guardianship proceedings, Aunt was not licensed with the State or Tribe.[4] Aunt acknowledged the pediatrician's testimony

---

[4] Aunt's tribal license expired in August 2023.

regarding I.R.S.'s special care needs but did not explain how she planned to meet them. Aunt had not interacted with I.R.S. since he was removed from her care in September 2021 (after being with her for four months) and had no interaction with M.W.A.H.

¶14 Regarding I.R.S.'s removal from her home, Aunt testified that, in 2021, the Bureau of Indian Affairs (BIA) investigated a disclosure by Aunt's stepdaughter of physical abuse by her father, Aunt's husband. In September 2021, the Crow Tribe, in collaboration with the BIA, removed Aunt's 16-year-old stepdaughter from the home. The Department removed I.R.S. from Aunt's home at the same time. Aunt attributed her stepdaughter's abuse allegations to "teenager stuff" based on the stepdaughter's poor relationship with her father, but admitted her stepdaughter was never returned to her home and that the investigation remained open for two years until the stepdaughter aged out. She also claimed the Department never told her why it removed I.R.S., but admitted there were allegations that she was "force-feeding" him. Aunt testified that I.R.S. "was kind of slow" and "threw a lot of tantrums," but denied the prolonged tantrums frustrated her or her husband.

¶15 The Department did not consider Aunt a suitable placement for the children based on the 2021 removal of I.R.S. from Aunt's home. While the specific details of I.R.S.'s removal were not discussed at the guardianship hearing, the Department caseworker testified that she ruled out Aunt as a permanent placement after discussion with the previous caseworker (assigned in 2021) regarding the circumstances of I.R.S.'s removal,

7

review of the BIA/Crow Tribe initial investigative report into the abuse disclosure, and email communication with the involved BIA agent.[5]

¶16 Following the hearing, the District Court made the required findings and conclusions pursuant to § 41-3-444, MCA, including that I.R.S. and M.W.A.H. were both adjudicated youths in need of care; the Department had made active reunification efforts to no avail; and that guardianship with the Department's recommended placement was in the children's best interests. The court also concluded the Department diligently searched for an ICWA-preferred placement but found none; Aunt was not a suitable placement based on I.R.S.'s removal from her home; and good cause existed to deviate from ICWA in this case. Accordingly, the District Court awarded guardianship of the children to their current foster parents, which Mother appeals.

## STANDARD OF REVIEW

¶17 "Whether a district court has complied with ICWA's substantive and procedural requirements presents a question of law that we review for correctness." *In re P.E.W.*, 2025 MT 114, ¶ 18, 422 Mont. 193, __ P.3d __ (citation omitted). We review a district court's findings of fact to determine whether those findings are clearly erroneous. *In re P.T.D.*, 2018 MT 206, ¶ 17, 392 Mont. 376, 424 P.3d 619. A finding of fact is clearly erroneous if not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if our review of the record firmly convinces this Court that a mistake

---

[5] The District Court sustained the children's counsel's hearsay objection, excluding any testimony regarding the substance of the Department caseworker's email communication with the BIA agent.

was made. *In re P.T.D.*, ¶ 17. We review a district court's denial or grant of a motion to intervene for an abuse of discretion but review underlying statutory interpretations de novo for correctness. *In re U.A.C.*, ¶ 9.

**DISCUSSION**

¶18    *1. Was Mother denied her right to counsel when the District Court adjudicated I.R.S. a youth in need of care without Mother's counsel present?*

¶19    Mother contends that she was denied her right to counsel because the District Court adjudicated I.R.S. a youth in need of care at a hearing where she appeared but her court-appointed counsel did not. Section 41-3-425(1), MCA, provides that "[a]ny party involved in a petition filed pursuant to 41-3-422 has the right to counsel in all proceedings held pursuant to the petition." *Accord A.W.S. v. A.W.*, 2014 MT 322, ¶ 13, 377 Mont. 234, 339 P.3d 414 ("[i]ndigent parents at risk of losing their parental rights under the provisions of Title 41 are entitled to counsel"); § 41-3-1316, MCA (right to counsel under Montana's Indian Child Welfare Act (MICWA)). The right to counsel applies at any "critical stage," including § 41-3-437, MCA, adjudication proceedings. *In re J.J.L.*, 2010 MT 4, ¶ 17, 355 Mont. 23, 223 P.3d 921. The right to counsel "carries with it a concomitant requirement that such counsel be effective." *In re J.L.L.*, ¶ 18.

¶20    On the day after the Department petitioned to adjudicate I.R.S. a youth in need of care, the District Court appointed counsel for Mother pursuant to § 41-3-425(2)(a), MCA ("court shall immediately appoint the office of state public defender to assign counsel for any indigent parent . . . of a child or youth in a removal, placement, or termination proceeding"). Mother attended the August 31, 2021 adjudicatory hearing without her

9

court-appointed counsel. The record does not explain counsel's absence. However, at the beginning of the hearing, Department counsel informed the District Court that the Department was in touch with Mother's counsel prior to the hearing and:

> My understanding is that the parties will be stipulating or otherwise not object to the relief requested today [YINC adjudication]. [Mother's counsel] did indicate that [Mother] is okay with the current placement and that she does not oppose the relief today.

Father likewise did not oppose YINC adjudication. The GAL also did not object. The Department made an offer of proof that the Northern Cheyenne Tribe's qualified ICWA expert would testify that returning I.R.S. to Mother or Father's care would place him at risk of serious emotional or physical harm. When asked, Mother had no questions about the YINC adjudication.

¶21    Here, Mother does not dispute that she stipulated to adjudicating I.R.S. a youth in need of care[6] and did not oppose the relief the State was requesting at that hearing. In fact, after the August 31, 2021 adjudication, she proceeded directly to a treatment plan hearing where she appeared with her counsel and never challenged the Department's representation regarding the pre-adjudicatory-hearing stipulation to the relief being requested or the District Court's YINC adjudication.

¶22    A Title 41, chapter 3, MCA, proceeding held without counsel constitutes statutory error because § 41-3-425(1), MCA, mandates representation. We have recognized that "denying the right to counsel in state-initiated termination proceedings would call into

---

[6] She also stipulated to adjudicating M.W.A.H. a youth in need of care on December 6, 2022.

10

question the constitutionality of those proceedings" because "[t]here is a substantial risk of an unfair procedure and outcome in proceedings brought to terminate parental rights." *A.W.S.*, ¶ 25 (citation and internal punctuation omitted). Nonetheless, we do not reverse in this case because of the parties' pre-hearing stipulation to the relief being requested and Mother's post-hearing acquiescence and participation, with representation, in the proceedings,[7] which eliminate a "substantial risk of an unfair procedure and outcome" in this situation. However, we underscore that courts must ensure that counsel is present at all critical stages of proceedings in cases governed by Title 41, chapter 3, MCA.

¶23    2. *Did the District Court err in failing to treat Mother's questions about transferring her case to tribal court as a motion to transfer under § 41-3-1310(3), MCA?*

¶24    Mother does not contest the District Court's authority to adjudicate the custody proceedings. However, she contends the court denied her "the right to seek tribal jurisdiction" by failing to treat her "request to transfer" the case to tribal court as an "oral motion" and then failing to grant that motion.

¶25    Section 41-3-1310(1), MCA (MICWA), provides that, except in certain circumstances, "[a]n Indian tribe has exclusive jurisdiction over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of that tribe." I.R.S. was born in the city of Billings, Montana, and lived with his Mother there at the time of emergency removal, and therefore neither resided in nor was domiciled

---

[7] The August 2021 hearing was the only record incidence of Mother appearing without counsel and it remains an unexplained anomaly.

11

within the Northern Cheyenne Indian Reservation. "[I]n a child custody proceeding involving an Indian child who is not residing or domiciled within the reservation of the Indian child's tribe," a state court "shall, in the absence of good cause to the contrary, transfer the proceeding to the jurisdiction of the Indian child's tribe on the motion of . . . either of the Indian child's parents, the Indian child's Indian custodian, or the Indian child's tribe." Section 41-3-1310(3), MCA. If either parent objects, "the court may not transfer the proceeding." Section 41-3-1310(5), MCA. "Any party to the child custody proceeding must have the opportunity to provide the court with the reasons that good cause exists to deny transfer of the proceeding." Section 41-3-1310(6)(a), MCA. "If a state court believes or any party asserts that good cause to deny transfer exists, the reasons for that belief or assertion must be provided orally or in writing on the record and to the parties to the child custody proceeding." Section 41-3-1310(6)(a), MCA.

¶26    "If the court denies transfer of jurisdiction, the court shall state its reasons for the denial orally on the record or in a written order." Section 41-3-1310(6)(c), MCA. "[P]ending receipt of a tribal court order accepting jurisdiction," the state court retains jurisdiction to "conduct additional hearings and enter orders that are in the best interests of the child and strictly comply with the requirements" of ICWA. Section 41-3-1310(7)(a)(i), MCA. If the tribal court accepts jurisdiction, the state court "shall dismiss the child custody proceeding with prejudice" and facilitate transfer to the tribe. Section 41-3-1310(7)(b), MCA. If the tribal court declines jurisdiction, the State court shall "proceed with adjudication of the child custody proceeding in compliance" with applicable law. Section 41-3-1310(9), MCA. *Accord* 25 U.S.C. § 1911; 25 CFR §§ 23.115-23.119.

¶27 Here, after the District Court adjudicated I.R.S. a youth in need of care at the August 31, 2021 hearing, Mother asked, "how would I transfer my case . . . [to] the Rez?" The court answered, "Your attorney can file a motion." Department counsel interjected, referring to a note she received from Mother's counsel prior to the hearing. According to her counsel's note, Mother had previously "considered a transfer request." Department counsel echoed that Mother could meet with her counsel and have him "make that motion on [her] behalf." The District Court added that transfer to tribal court was "not automatic," and the Tribe would ultimately determine "whether or not they would accept transfer." Mother then asked, "do you know how they work? . . . I'm just trying to go through . . . whatever is fastest." Department counsel repeated that the transfer process would begin upon Mother's counsel "making that motion." Before closing the hearing, the District Court reminded that Mother's attorney could "visit with her about filing a motion to transfer to the Tribe" before the upcoming treatment plan hearing.

¶28 First, we disagree that Mother "clearly and unambiguously told the district court she wanted her case moved to tribal court." The record simply does not support that assertion. Instead, Mother asked *how* she could get her case transferred to the Northern Cheyenne Tribe. The District Court explained that she could initiate a transfer to tribal court by her counsel's filing a motion and instructed her to consult with counsel regarding filing that motion. Mother did not ask, even informally, to transfer her case to tribal court and the District Court therefore did not erroneously fail to construe her questions about *how* to transfer her case as a motion to transfer, oral or otherwise. *See* § 41-3-1310(3), MCA (court shall transfer proceedings "on the motion" of either parent); *Depositors Ins. Co. v.*

13

*Sandidge*, 2022 MT 33, ¶ 10, 407 Mont. 385, 504 P.3d 477 ("a motion is a written or oral application requesting a court to make a specified ruling or order" (punctuation and citation omitted)).[8]

¶29 Second, the District Court correctly explained that, once initiated, the transfer process was "not automatic" and the Tribe would have to formally accept jurisdiction. Mother's arguments on appeal reflect a misunderstanding of § 41-3-1310, MCA, insofar as she contends a motion to transfer triggers an immediate and mandatory transfer to the child's tribe's jurisdiction.[9] Rather, § 41-3-1310, MCA, provides that a court shall transfer the proceeding only "in the absence of good cause" and upon consent of both parents, and further requires an opportunity for any party to the proceedings to assert that good cause exists to deny transfer and to be heard on that assertion. Section 41-3-1310(3), (5), (6), MCA; *accord* 25 U.S.C. § 1911(b); 25 CFR §§ 23.117, 23.118. Further, the state court retains jurisdiction (except to enter a "final order" in the custody proceeding) "pending receipt of a tribal court order accepting jurisdiction." Section 41-3-1310(7), MCA. A tribal

---

[8] Mother asserts that her case is analogous to *A.W.S.*, where we held that an indigent mother facing termination of her parental rights in an adoption proceeding under § 42-2-603, MCA, *and proceeding pro se*, was entitled to assistance of court-appointed counsel. *A.W.S.*, ¶¶ 15, 18, 26. In response to the appellee's assertion that the mother forfeited her constitutional claim, we noted that, "although Mother did not request counsel formally, . . . she preserved the issue when she explained that she represented herself only because she did not have the money to employ an attorney." *A.W.S.*, ¶ 21 ("we have recognized that pro se litigants are not required to use specific words when requesting counsel"). *A.W.S.* is factually and legally distinct and thus not applicable here.

[9] *See* Mother's Reply Brief, p. 7 ("if the district court had properly treated the request as an oral motion, the court would have been required by law to immediately refer the matter to the appropriate tribal court for further determination, resulting in a different outcome").

14

court may entertain a request to accept jurisdiction, but decline, in which case, the proceedings continue in state court. Section 41-3-1310(9), MCA; *accord* 25 U.S.C. § 1911(b) ("such transfer shall be subject to declination by the tribal court").

¶30 Finally, tangentially related to her right to counsel claim, we are unpersuaded that the District Court's not construing Mother's questions about how to transfer her case to tribal court as an informal oral motion to transfer resulted in any prejudice.[10] According to her counsel's note, referenced on the record at the August 2021 YINC hearing, Mother and her counsel had, at some point prior, discussed and "considered a transfer request." Notwithstanding previously consulting with her counsel on the issue, and the District Court's reminder that she do so again before the next hearing, Mother never pursued a transfer to the Northern Cheyenne Tribe's jurisdiction at any point in I.R.S.'s custody proceedings.[11] Moreover, after the Department formally notified the Northern Cheyenne Tribe of the custody proceedings, it never intervened under § 41-3-1310(3)(c), MCA.

¶31 Mother was not, as she claims, precluded from seeking transfer of her case to tribal court. Instead, Mother or the Tribe could have sought transfer at any time but did not. Accordingly, we hold that the District Court did not erroneously fail to construe Mother's questions regarding transfer to tribal court as a formal or informal motion to transfer under § 41-3-1310(3), MCA.

---

[10] Mother asserts that, because her counsel did not appear at the hearing, she was "forced to represent herself" to her detriment regarding the jurisdiction issue. We disagree.

[11] She also did not seek to transfer the separately-docketed proceedings regarding M.W.A.H.

15

¶32    *3. Did the District Court erroneously deny Aunt's motion to intervene in the guardianship proceedings without a hearing?*

¶33    As pertinent here, § 41-3-422(9)(b), MCA, provides:

> A foster parent, preadoptive parent, or relative of the child who is caring for or . . . has cared for a child who is the subject of the petition who appears at a hearing set pursuant to this section may be allowed by the court to intervene in the action if the court, after a hearing in which evidence is presented on those subjects provided for in 41-3-437(4), determines that the intervention of the person is in the best interests of the child.

Section 41-3-437(4), MCA, as referenced in § 41-3-422(9)(b), MCA, pertains exclusively to "a case in which abandonment has been alleged" by the State. In *In re U.A.C.*, ¶¶ 10-17, we held that "persons seeking intervention" in Title 41, chapter 3, MCA, proceedings "must satisfy two threshold requirements before a district court may conduct a hearing to address the motion to intervene: (1) the party seeking intervention must be in one of the enumerated groups—a foster parent, a preadoptive parent, or relative of the child who has cared for a child; and (2) there must be an allegation of abandonment."[12] We also said that due process does not require a district court to hold a hearing on a party's intervention request where the party is precluded from intervening "as a matter of law." *In re U.A.C.*, ¶ 17.[13]

¶34    By contrast, § 41-3-422(9)(a), MCA, provides:

---

[12] We also held that §§ 41-3-422(9)(b) and 41-3-437(4), MCA, "displace" M. R. Civ. P. 24 "in Title 41 dependency and neglect actions." *In re U.A.C.*, ¶¶ 12, 16; *accord In re R.N.*, 2024 MT 115, ¶ 11, 416 Mont. 462, 549 P.3d 452 ("[t]he Montana Rules of Civil Procedure and Evidence apply to child welfare proceedings except as modified in Title 41" (citing *In re U.A.C.*, ¶ 12)).

[13] *Compare In re R.N.*, ¶¶ 3-7, 14-15 (when a party satisfies the requirements of § 41-3-422(9)(b), MCA, "the district court must hold a hearing pursuant to § 41-3-437(4) . . . to hear evidence related to the circumstances of the alleged abandonment and the best interests of the child").

16

Any person interested in any cause under this chapter has the right to appear. Any foster parent, preadoptive parent, or relative caring for the child must be given legal notice by the attorney filing the petition of all judicial hearings for the child and has the right to be heard. The right to appear or to be heard does not make that person a party to the action.

¶35 Aunt filed a motion to intervene in the custody proceedings on September 11, 2023. At a scheduled hearing the next day, the parties discussed Aunt's motion with the court and the court set a hearing "on intervention" for October 4, 2023. At the October 4, 2023 hearing, Aunt argued that Montana's ICWA creates a "private right to intervene" in Title 41, chapter 3, MCA, proceedings for "extended family members." The Department countered that § 41-3-422(9)(b), MCA, and *In re U.A.C.* permit intervention only in cases of alleged abandonment, and ICWA permits intervention only by an "Indian Custodian," which Aunt was not. *See* 25 U.S.C. § 1911(c) ("the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point" in state court foster care placement or parental rights proceedings); § 1903(6) (defining "Indian custodian" as "any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of such child"); *accord* § 41-3-1303(11), MCA (MICWA definition of "Indian custodian" same as ICWA). While the GAL "believe[d] [Aunt] could be considered as a possible placement for the kids," she disagreed Aunt's status as an ICWA-preferred placement "ma[de] her necessarily a party that [wa]s able to intervene."

17

¶36 Noting that § 41-3-422(9)(b), MCA (2001), "abrogated" Aunt's cited authority, *In re M.E.M.*, 223 Mont. 234, 725 P.2d 212 (1986),[14] the District Court gave Aunt's counsel an opportunity to address the case law and articulate "the basis to intervene." Counsel answered:

> I believe Section 422 says that any party interested may appear, and that is different than intervening. . . . But as long as, you know, [Aunt] can appear and be present at all proceedings, that *we would be happy with her simple appearanc*e . . . in the proceeding *without formally being told she is a party*.

(Emphasis added.) The Court then asked whether, "given [Aunt's] change in position from intervention to interested party," the Department had any objection. Although Department counsel disputed that Aunt was a "relative caring for" the children under § 41-3-422(9)(a), MCA, or an "Indian custodian" under ICWA, counsel did not object to Aunt's "presence in the courtroom" or sending her notice going forward. The District Court then twice confirmed that Aunt no longer sought intervention, to wit:

> [Court]: So just to be clear, *you're withdrawing your motion to intervene* and just seeking recognition of interested party?
>
> [Counsel]: *Yes.*
>
> .  .  .
>
> [Court]: So just for the record *you have withdrawn your motion to intervene*?
>
> [Counsel]: *Yes.*

(Emphasis added.)

---

[14] In *In re M.E.M.*, we held that an Indian child's aunt had a "right to intervene" in adoption proceedings under M. R. Civ. P. 24 because she was an "extended family member" and had an "interest" in the proceedings "created by" ICWA adoptive placement preferences. *In re M.E.M.*, 223 Mont. at 237, 725 P.2d at 214.

¶37 Despite the District Court holding a hearing specifically for Aunt's motion to intervene, Mother asserts numerous times on appeal that Aunt "should have been heard on her motion to intervene." The record clearly establishes that she was. Mother acknowledges, as she must on this record, that Aunt withdrew her motion to intervene. Once a motion is formally withdrawn, any unresolved legal question underlying the motion is no longer justiciable unless preserved through other procedural mechanisms.

¶38 Moreover, contrary to Mother's assertions on appeal, the District Court did not render any "clear legal holding" regarding Aunt's intervention motion. When asked to address § 41-3-922(9)(b), MCA, and *In re U.A.C.* and argue the legal basis for intervention, Aunt withdrew her motion and stipulated to proceeding as an interested person under § 41-3-422(9)(a), MCA. Mother insists the District Court rendered a record "legal conclusion" when it stated § 41-3-422(9)(b) "abrogated" *In re M.E.M.*, and the question is therefore ripe for de novo judicial review. However, we cannot construe the District Court's statement as a *ruling* on the matter because the court never *applied* § 41-3-422(9)(b), *In re U.A.C.*, MICWA, ICWA, or any law for that matter, to resolve Aunt's motion to intervene. Instead, Aunt withdrew her motion, mooting the question of whether she was entitled to intervene in the proceedings. *In re Big Foot Dumpsters & Containers, LLC*, 2022 MT 67, ¶ 10, 408 Mont. 187, 507 P.3d 169 ("when an issue presented at an action's outset ceases to exist or is no longer 'live,' . . . the issue is moot"); *Adkins v. Livingston*, 121 Mont. 528, 532, 194 P.2d 238, 240 (1948) (this Court "will not pass upon moot questions").

19

¶39    Therefore, Mother effectively seeks an advisory opinion on the interplay between Montana's ICWA (silent on intervention), motions to intervene under § 41-3-422(9)(b), MCA, and our holding in *In re U.A.C.*,[15] which we decline to issue. We have consistently held that this Court does not render advisory opinions. *Plan Helena, Inc. v. Helena Reg'l Airport Auth. Bd.*, 2010 MT 26, ¶¶ 6-15, 355 Mont. 142, 226 P.3d 567. Although statutory amendments to § 41-3-422, MCA, limit intervention rights, Montana's constitutional and statutory commitments to protecting Indian cultural integrity must always be considered. Courts must remain vigilant in ensuring that statutory interpretations do not inadvertently undermine these vital protections. Here, the issue was moot because Aunt withdrew her motion.

¶40    *4. Did the District Court erroneously conclude that good cause existed to deviate from ICWA placement preferences?*

¶41    Mother contends the Department did not establish by clear and convincing evidence that Aunt was not a suitable permanent placement for I.R.S. and M.W.A.H. and therefore did not prove that good cause existed to deviate from ICWA placement preferences.

¶42    "Enacted in 1978 to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families, ICWA imposes heightened federal standards for the removal of Indian children from Indian families." *In re L.H.*, 2021 MT

---

[15] *See* Mother's Opening Brief, p. 35 ("it would . . . be appropriate for this Court *to clarify* that, while a non-Indian individual may be statutorily barred from intervention except in cases of abandonment, a person recognized as an extended family member under ICWA is entitled to a hearing on whether he or she should be allowed to intervene" (emphasis added)); Mother's Reply Brief, p. 11 ("it would . . . be appropriate for this Court *to now clarify* whether a person recognized as an extended family member under ICWA is entitled—at a minimum—to a hearing on whether he or she should be allowed to intervene" (emphasis added)).

199, ¶ 11, 405 Mont. 173, 492 P.3d 1218 (citing 25 U.S.C. §§ 1902, 1911, 1912(d)-(f)). "At the core of ICWA is the fundamental assumption that it is in the Indian child's best interest that its relationship to the tribe be protected." *In re L.D.*, 2018 MT 60, ¶ 12, 391 Mont 33, 414 P.3d 768 (citing *Mississippi Band of Choctaw Indians v. Holyfield, et al.*, 490 U.S. 30, 32 n.24, 109 S. Ct. 1597, 1609 (1989)).

¶43    ICWA provides that, when placing Indian children, "preference shall be given, in the absence of good cause to the contrary," to members of the child's extended family, members of the child's tribe, or other Indian families, among others. *In re D.L.L.*, 2025 MT 98, ¶ 13, 421 Mont. 522, 568 P.3d 552 (citing 25 U.S.C. § 1915(a)-(b)).  A district court therefore may depart from ICWA's placement preferences only upon a showing of "good cause." *In re P.E.W.*, ¶ 30.  We apply BIA-promulgated guidelines when interpreting ICWA's "good cause" requirement.  *In re P.E.W.*, ¶¶ 29-30 (citing 25 CFR § 23.132(c); *Guidelines for Implementing the Indian Child Welfare Act* (Dec. 2016) (updated at 81 Fed. Reg. 38,778 (June 14, 2016))); *In re C.H.*, 2000 MT 64, ¶¶ 12-13, 299 Mont. 62, 997 P.2d 776.[16]  According to the BIA Guidelines, state courts retain the "ultimate authority" under 25 CFR § 23.132 to determine whether "good cause" exists, and the rule permits court and agency consideration of the "unique needs of a particular Indian child in making a good cause determination." *In re P.E.W.*, ¶ 30 (citing BIA

---

[16] In *In re C.H.*, ¶¶ 20-22, we held that, because ICWA presumes ICWA-preferred placement is in the child's best interest, the best-interest standard is not applicable to the "good cause" analysis under 25 U.S.C. § 1915.

Guidelines H.4, p. 61); *see also* BIA Guidelines H.4 (further noting that 25 CFR § 23.132 "factors . . . not exhaustive").

¶44 "Good cause" to deviate from ICWA-preferred placements may include "[t]he unavailability of a suitable placement after a determination by the court that a diligent search was conducted to find suitable placements meeting the preference criteria, but none has been located." 25 CFR § 23.132(c)(5); *accord* § 41-3-1329(8)(c)(v), MCA (MICWA). A "diligent search" for an ICWA-preferred placement should be thorough, ongoing, and involve inquiring about potential placements, including known extended family members; contacting the child's tribe; and contacting and following-up with potential placements. *In re P.E.W.*, ¶ 29 (citing BIA Guidelines H.3, pp. 58-59). The suitability of a placement is to be considered in light of "the prevailing social and cultural standards of the Indian community" of which the child is a part. *See* 25 CFR § 23.132(c)(5); § 41-3-1329(8)(c)(v), MCA; *accord* BIA Guidelines H.4 ("nothing in the rule eliminates other requirements under State or Federal law for ensuring that placements will protect the safety of the Indian child").

¶45 Mother does not contend the Department failed to conduct a "diligent search" for an ICWA-preferred placement. In fact, the record indicates that since I.R.S.'s removal from Aunt's home in 2021, the Department (1) contacted the Northern Cheyenne Tribe numerous times in 2021, 2022, and 2023; (2) interviewed Mother (and I.R.S.'s father) to ascertain possible placements; (3) conducted a Seneca search, searched Close Family Registry, and searched social media and newspapers for kin; and (4) contacted Mother and

22

Father's potential placements but received no response or ruled them out based their either living out of state, having prior Department involvement,[17] or being incarcerated.

¶46    As for Aunt as a potential placement, the Department caseworker testified she was not assigned to the case when the Department removed I.R.S. from Aunt's home in 2021. She therefore reached out to Aunt to "get an update on her living situation . . . compared to" where her family was when I.R.S. was removed. Aunt confirmed she still lived with her husband but denied any concerns regarding I.R.S. or her stepdaughter's removal and claimed that "nothing ever happened." The caseworker testified that: (1) she reviewed the prior caseworker's notes and consulted with her regarding I.R.S.'s removal from Aunt's home; (2) she reviewed the initial BIA report and communicated with a BIA agent regarding the 2021 investigation and Crow Tribe removal of Aunt's stepdaughter from her home; (3) at the same time the Crow Tribe removed Aunt's stepdaughter, the Department removed two-year-old I.R.S. based on the stepdaughter's disclosure that I.R.S. was physically abused "as well"; and (4) the BIA investigation resulted in substantiation of the stepdaughter's abuse allegations. Based on this information, the Department caseworker did not consider Aunt a suitable placement for the children, despite her being an "extended family member" under ICWA.

¶47    While neither would opine regarding Aunt's suitability as a permanent placement for the children, the Northern Cheyenne Tribe's ICWA expert and ICWA agent each testified the Tribe had specific foster placement licensing requirements. It was undisputed

---

[17] Mother's other sister, maternal aunt, and grandmother all had "CPS history," including "substantiations."

that Aunt was not licensed through the Northern Cheyenne Tribe at that time. Aunt testified that she tried to get the Northern Cheyenne Tribe to intervene in the proceedings on her behalf, but "they wouldn't." The Tribe's ICWA agent also testified that the Northern Cheyenne Tribe teaches to "never hit our children" and she was therefore very concerned about the children's exposure to any physical abuse and, as a tribal-member great grandmother, did not "agree with that at all." She advocated for guardianship of I.R.S. and M.W.A.H. with their current foster placements "in the best interests *and the safety* of the children."

¶48 Conversely, Aunt characterized her stepdaughter's abuse allegations as "teenager stuff," minimized the BIA/Crow Tribe investigation and removal of her stepdaughter, and denied that she or her husband physically abused I.R.S. It was within the province of the District Court to weigh conflicting evidence and assess witness credibility. *In re A.F.*, 2003 MT 254, ¶ 24, 317 Mont. 367, 77 P.3d 266 (we defer to a lower court's credibility determinations because it "had the benefit of observing the demeanor of witnesses"). Clear and convincing evidence is a preponderance of evidence that is definite, clear, and convincing; it is not "unanswerable or conclusive evidence or evidence beyond a reasonable doubt." *In re G.M.*, 2008 MT 200, ¶ 23, 344 Mont. 87, 186 P.3d 229. The District Court concluded the Department met its burden to show that Aunt was not a suitable placement based on I.R.S.'s removal from her home in 2021, and that there was thus good cause to deviate from permanent placement with her, despite Aunt's status as an ICWA-preferred placement. This conclusion is supported by substantial credible evidence sufficient to satisfy the clear and convincing evidence standard.

¶49 While we affirm the District Court's conclusion, we acknowledge that ICWA's placement deviation standards require a showing beyond generalized concerns. *See* 25 CFR § 23.132(b) (stating that good cause to depart from placement preferences must be supported by clear and convincing evidence). Although the Department had historical safety concerns, it did not conduct a current home study or seek updated licensing information. In future proceedings, courts and the Department should take care to document not only initial removal reasons but also renewed efforts to confirm that no viable ICWA-preferred placements exist at the time of permanency.

## CONCLUSION

¶50 We hold that Mother was not denied her right to counsel when the District Court adjudicated I.R.S. a youth in need of care. We further hold that the District Court did not erroneously fail to construe Mother's questions about how to transfer her case to tribal court as a motion to transfer under § 41-3-1310, MCA. The District Court held a hearing on Aunt's motion to intervene and did not deny her motion; Aunt withdrew her motion at the hearing and the issue is moot. Finally, we hold the District Court correctly concluded the Department established good cause to deviate from ICWA placement preferences. ICWA's protections must be faithfully applied in every child custody proceeding involving an Indian child. On this record, the statutory and procedural safeguards were satisfied.

¶51 Affirmed.

/S/ KATHERINE M BIDEGARAY

25

We Concur:

/S/ CORY J. SWANSON
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE